UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMPSON STRONG-TIE COMPANY, INC, | Case No. 3:18-cv-01188-WHO |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO TRANSFER AND DENYING MOTION TO DISQUALIFY COUNSEL** |
| OZ-POST INTERNATIONAL, LLC, | |
| Defendant. | Re: Dkt. No. 30, 38 |

## INTRODUCTION

After receiving demand letters from defendant Oz-Post International, LLC ("OZCO") regarding alleged infringement of one of its patents, plaintiff Simpson Strong-Tie, Inc. brought this action for declaratory judgment. It also asserts affirmative claims for false advertising. OZCO wishes to transfer this action to the Eastern District of Texas, the venue where OZCO chose to file its patent infringement action and that is near both its headquarters and a warehouse operated by Simpson Strong-Tie. But because this action was filed first and the other factors do not favor transfer, OZCO's motion to transfer is DENIED.

In addition, Simpson Strong-Tie moves to disqualify OZCO's counsel given its concurrent representation of Simpson Strong-Tie in unrelated matters. In the particular circumstances of this case, there is no actual threat to the duty of loyalty owed by Foley & Lardner LLP ("Foley") to Simpson Strong Tie, and disqualification would harm OZCO by removing its long-time patent counsel without benefiting Simpson Strong Tie, except tactically. Simpson's motion is also DENIED.

## I.  FACTUAL BACKGROUND

### A.  The Parties and the Dispute

Simpson Manufacturing Co., Inc. ("Simpson Manufacturing") conducts all of its domestic business through its wholly-owned subsidiary Simpson Strong-Tie Company, Inc. ("Simpson Strong-Tie"), a California corporation headquartered in Pleasanton, California. Magstadt Decl. ¶¶ 1, 3 (Dkt. No. 38-2). Simpson Strong-Tie "designs, engineers and manufactures structural connectors, fasteners, and fastening systems… ." Murphy Decl. ¶ 3 (Dkt. No. 39-1). Simpson Strong-Tie's United States' operations account for 77 percent of Simpson Manufacturing's total revenue. Magstadt Decl. ¶ 5. The companies are "operationally intertwined: there is complete overlap in management control; they share the same mailing address and principal place of business; and they have the same Chief Executive Officer and Chief Financial Officer." *Id*. ¶ 6.

Simpson Manufacturing is a publicly traded company with over 2,900 employees and first quarter 2018 sales of $244.8 million. Simpson Manufacturing 2017 10-K (Ridley Decl. ¶ 4; *id*., Ex. 3; Dkt. No. 30-4 at 10); Simpson Manufacturing 2018 First Quarter Financial Results (Ridley Decl. ¶ 3; *id*., Ex. 2; Dkt. No. 30-3). Neither Simpson Strong-Tie nor Simpson Manufacturing has an internal legal department. Magstadt Decl. ¶ 7.

The Pleasanton office houses approximately 250 employees focused on business operations, including "research and development, finance, and marketing[,]" and in particular, the inventors and instrumental employees involved in the development of the "Hex-Head Washer" and other ornamental wood connectors and fasteners in the "Outdoor Accents" product line (the "Accused Products"), the subject of the present dispute. Murphy Decl. ¶¶ 5–9. Simpson Strong-Tie states that both of the named inventors, the product manager, its vice president of national accounts, its vice president of connectors, and two research and developer engineers, among others, work out of the Pleasanton facility. *Id*. ¶ 8. It also notes that the finance team and the Sales and Marketing unit are located in Pleasanton. *Id*. ¶¶ 3, 12.

Simpson Strong-Tie also has a 518, 400 square foot warehouse and office located in McKinney, Texas, which is within the Eastern District of Texas. Ridley Decl. ¶¶ 5–6. No

United States District Court
Northern District of California

employee at the Texas Branch had any involvement in developing the Accused Products, and no evidence relevant to this dispute was generated or maintained there. Murphy Decl. ¶ 14. Simpson Strong-Tie offers its Outdoor Accents decorative hardware at 69 dealers within 100 miles of the federal courthouse in Sherman, Texas, Ridley Decl. ¶ 7, but California accounts for the greatest amount of sales of the Outdoor Accents product line, Murphy Decl. ¶ 17.

Oz-Post International LLC dba OZCO Building Products ("OZCO"), a small company with only 11 employees, is headquartered in Richardson, Texas. Hill Decl. ¶¶ 2–3 (Dkt. No. 30-8). All current and former employees with knowledge of this dispute, as well as relevant customers and contacts, live in northeast Texas. *Id.* ¶¶ 3–11. OZCO has 16 dealers in California, and more than 120 dealers in Texas. *Id.* ¶ 2.

In late 2017, OZCO entered into a sales and distribution agreement with MiTek Industries, Inc., a global building products company and a direct competitor of Simpson Manufacturing. *See* "MiTek Enters Into North American Sales and Distribution Agreement with OZCO Building Products" (Minor Decl. ¶ 11; *id.*, Ex. H). The agreement means that "Ozco and its products will have access to MiTek's North American sales force, and will be available through MiTek's large footprint of retail and pro-dealer customers[,]" including in California. *Id.*

On February 15, 2017, OZCO sent Simpson Strong-Tie a demand letter to its Pleasanton headquarters indicating that the design of Simpson Strong-Tie's decorative hardware within its "Mission Collection" is "confusingly similar to Ozco's Laredo Sunset ornamental design, and it infringes the trade dress rights of Ozco." First Demand Letter from OZCO to Simpson Strong-Tie (Minor Decl. ISO Opp'n to Mot. to Transfer ¶ 4; *id.*, Ex. B).[1] The letter also referenced OZCO's patents and certain pending patent applications. *Id.* Simpson Strong-Tie's California-based counsel responded on March 22, 2017 expressing its view that "Ozco's Laredo Products are not protectable trade dress under the Lanham Act." 3/22/17 Letter from Simpson Strong-Tie to OZCO (Minor Decl. ISO Opp'n to Mot. to Transfer ¶ 5; *id.*, Ex. C).

On January 31, 2018, OZCO sent Simpson Strong-Tie a second demand letter indicating

---

[1] This letter was sent by counsel at Gardere Wynne Sewell ("Gardere"), prior to its merger with Foley & Lardner LLP, which is relevant to the motion to disqualify counsel, discussed below.

that it owns U.S. Patent No. D798,701 ("the '701 Patent"), which issued on October 3, 2017, and

accusing Simpson Strong-Tie's outdoor accents structural wood screw and Hex-Head Washer of

patent infringement. Second Demand Letter from OZCO to Simpson Strong-Tie (Minor Decl.

ISO Opp'n to Mot. to Transfer ¶ 6; *id*., Ex. D). The letter states that OZCO sought to "negotiate a

resolution that allows Simpson to continue to use OZCO's patented design." *Id*. Simpson Strong-

Tie disputes that the Accused Products infringe the '701 patent or that a license is appropriate. *See*

*generally* Compl. (Dkt. No. 1).

### B.     The Accused Products

Simpson Strong-Tie's Outdoor Accents product line includes various sizes and style of

connectors and fasteners. Murphy Decl. ¶ 7. When the Hex-Head Washer and structural wood

screw are used together, they offer the appearance of a bolted connection. *Id*. Simpson Strong-

Tie owns U.S. Patent No. D733,546 ("the '546 Patent"), entitled "Screw With Decorative Head,"

which issued on July 7, 2015 and discloses a hex-head washer and screw very similar to the

Accused Products. *Id*. ¶ 6. Simpson Strong-Tie also owns a pending utility patent for the Hex-

Head Washer and fastener combination at issue, including an "extending tube" not disclosed in the

'546 Patent. *Id*. ¶¶ 5–6; *see* U.S. Patent App. Ser. No. 15/279,193 ("the '193 Application"). All

design, development, testing, and refining of the Accused Products took place in Pleasanton,

California. *Id*. ¶¶ 7, 9.

### C.     Attorney-Client Relationships

#### 1.     Simpson Manufacturing's Relationship with Foley[2]

In June 2014, Simpson Manufacturing and Foley[3] entered into an Engagement Letter

Agreement ("the Foley Engagement Agreement") in which Foley agreed to provide "general labor

---

[2] The parties have variably referenced "Simpson Manufacturing" and "Simpson Strong-Tie" and "Simpson," which has led to some confusion, as I discuss in analyzing the motion to disqualify counsel. I mention it here because Simpson Strong-Tie has labeled this section of its background "Simpson Strong-Tie's Attorney-Client Relationship With Foley," but the only agreement was between Foley and Simpson Manufacturing.

[3] Effective April 1, 2018, Foley & Lardner LLP merged with Gardere Wynne Sewell LLP; the surviving entity is known as Foley & Lardner, LLP d/b/a Foley Gardere. Minor Decl. ¶ 9.

and employment advice and counseling, including representing [Simpson Manufacturing] in labor negotiations… ." 6/5/14 Foley Engagement Agreement (Magstadt Decl. ¶ 8; *id*., Ex. A). Kamran Mirrafati, a partner at Foley, sent Simpson Manufacturing the Foley Engagement Agreement on behalf of Foley.[4] *Id.* Brian Magstadt, chief financial officer of Simpson Manufacturing (*and Simpson Strong-Tie*), signed the agreement, but did not consult with legal counsel prior to executing it. Magstadt Decl. ¶¶ 1, 9.

The Foley Engagement Agreement includes the following provisions:

> 3. <u>Conflicts of Interest</u>
>
> We have checked our records based on the information [Simpson Manufacturing] has provided to us at this time. Our search included the names of business entities, if any, about which you have informed us of an affiliation that could give rise to significant concerns if we should be involved in matters for other clients directly adverse to such business entities. We have determined that there is no conflict of interest that prevents us from working on this Matter.
>
> This Agreement creates an attorney/client relationship only between [Foley] and [Simpson Manufacturing]. Therefore, [Simpson Manufacturing] agrees that this engagement does not create an attorney/client relationship between [Foley] and any business entities with which you are affiliated unless subject to separate engagement Agreement. [Simpson Manufacturing] will not provide [Foley] with any confidential information about any of its other subsidiaries or affiliates, and [Foley] will not provide services to [Simpson Manufacturing's] subsidiaries or affiliates unless [Foley] represents such subsidiary or affiliate. [Simpson Manufacturing] agrees that [Foley's] representation of [Simpson Manufacturing] will not create any conflicts of interest in the event that other clients of [Foley] are adverse to a subsidiary or affiliate of [Simpson Manufacturing] (unless that subsidiary or affiliate also is represented by [Foley]).
>
> 4. <u>Advance Waiver of Conflict</u>
>
> a. [Simpson Manufacturing] agrees that [Foley] may represent current or new clients in work directly adverse to [Simpson Manufacturing], and may be adverse to the business entities with which you are affiliated, provided such work is not substantially related to the Matter and [Foley] does not use any of [Simpson Manufacturing's] confidential information in representing such clients. This consent includes our being counsel in litigation or other

---

[4] Simpson notes that it had an ongoing legal relationship with Mirrafati and kept its labor and employment work with him when he moved to Foley from Seyfarth Shaw LLP in 2014. Magstadt Decl. ¶ 11.

> formal disputes adverse to [Simpson Manufacturing]. In addition, [Simpson Manufacturing] agrees that, even though [Foley] represents [Simpson Manufacturing] in this Matter, [Foley]
> may represent in the future other parties who are adversely involved in the Matter, or who may later become adversely involved in the Matter, as long as that representation of other parties is substantially unrelated to the Matter. By way of examples only, and assuming such representations are not substantially related to the Matter, we may represent one or more parties in bankruptcy cases that may have interests adverse to [Simpson Manufacturing], we may represent clients with regard to intellectual property rights that may be adverse to those of [Simpson Manufacturing], or we may represent clients in contract negotiations adverse to [Simpson Manufacturing]. [Foley] agrees that it will not use any of [Simpson Manufacturing's] confidential information in representing such other clients and, when needed, we will establish an ethical wall to assure that confidential information is not exchanged between those working on the Matter and those working for such other clients.

Foley Engagement Agreement at 1–2.

Even though the agreement is between Foley and Simpson Manufacturing, Foley has provided legal services to Simpson Strong-Tie in various labor and employment cases, for which Simpson Manufacturing has paid approximately $224,000. Magstadt Decl. ¶ 10. Currently, Foley is representing Simpson Strong-Tie in an employee dispute pending before the Department of Fair Employment and Housing (DFEH). *Id.* ¶ 12.

### 2. Simpson Manufacturing's Relationship with Gardere

In 2015, Simpson Manufacturing engaged Gardere Wynne Sewell LLP for legal services in connection with a Texas state property condemnation proceeding in McKinney, Texas ("the Condemnation Action"). Magstadt Decl. ¶ 20; *see* Gardere Engagement Agreement (Magstadt Decl., Ex. D). The agreement provides that "the representation … does not give rise to an attorney-client relationship with any parent, subsidiary or affiliate of [Simpson Manufacturing]." Gardere Engagement Agreement at 1. The agreement also contains a conflict waiver provision. *See id.* at 2–3.

In December 2017, Simpson Manufacturing and the State of Texas agreed to settle the Condemnation Action, but, in April 2018, the State of Texas contacted Phil Morgan, the Gardere attorney representing Simpson Manufacturing, about an issue with the judgment. Magstadt Decl. ¶ 25. Morgan forwarded the information on to Magstadt and informed him that he and Kate David no longer represented Simpson Manufacturing because they were no longer with Gardere. *Id.*

6

Magstadt emailed the Houston Office Managing Partner at Gardere seeking the firm's continued assistance, but no one responded. *Id.* Gardere never terminated its representation of Simpson Manufacturing and Simpson Manufacturing recently received a bill (from Foley) dated May 31, 2018. *Id.* ¶ 26. Magstadt had to engage outside counsel to resolve the Condemnation Action. *Id.* ¶ 25.

### 3. The Current Dispute and Foley's Conflict of Interest

On February 6, 2018, a week after OZCO's Second Demand Letter, *see* above section I.A, Simpson Strong-Tie's counsel sent a letter to Gardere about its conflict of interest related to the Condemnation Action.[5] 2/6/18 Letter from Simpson Strong-Tie to Gardere (Minor Decl. ¶ 4; *id.*, Ex. F). Simpson Strong-Tie communicated its view that Gardere's representation of OZCO breached its duty of loyalty to Simpson Manufacturing and demanded its immediate withdrawal. *Id.*

On February 8, 2018, Gardere responded, indicating that its "representation of OZCO against Simpson Strong-Tie does not create an ethical conflict because Gardere is not adverse to its client, [Simpson Manufacturing]." 2/8/18 Letter from Gardere to Simpson Strong-Tie (Minor Decl. ¶ 5; *id.*, Ex. G). It further noted that "it disclosed its intended representation that would be adverse to Simpson Strong-Tie, and [Simpson Manufacturing's] vice president, Jeff Mackenzie, consented to that adverse representation on condition that no information was shared between the lawyers handling the condemnation case and the lawyers handling the patent matter."[6] *Id.*

According to Gardere, Kate David, one of its attorneys responsible for handling the Condemnation Action, "advised Mr. Mackenzie that Gardere 'had been approached about filing a patent infringement suit against Simpson Strong Tie Co.,' and pointed out the [separate entity conflict] provision in our engagement agreement with [Simpson Manufacturing]." *Id.*; *see also*

---

[5] At this time, Foley and Gardere had not yet merged, and Foley did not yet represent OZCO. According to Simpson Strong-Tie, Foley's representation of OZCO first became known to it when Foley filed a notice of appearance in this case on March 16, 2018. Minor Decl. ¶ 8. Simpson Strong-Tie indicates that "the facts relating to Gardere's representation of Simpson Manufacturing are not necessarily material to the Court's ruling[,]" but are included "to provide the Court with additional background information… ." Mot. to Disqualify at 7 n.4 (Dkt. No. 38).

[6] Jeff Mackenzie is no longer employed at Simpson Manufacturing or Simpson Strong-Tie. Magstadt Decl. ¶ 21.

Magstadt Decl. ¶ 23 (pointing out that "Ms. David never responded to Mr. Mackenzie, never gave him the identity of the person or entity with whom the potential conflict had arisen, never spoke further with Mr. Mackenzie about the potential conflict, never advised Mr. Mackenzie to seek independent legal counsel to evaluate the potential conflict, never informed Mr. Mackenzie that Gardere had actually been retained by this unidentified third party…, and never asked Mr. Mackenzie or anyone else at Simpson Manufacturing to sign a conflict waiver."). Mackenzie responded to David's email with "I don't think that would be an issue so long as no information is shared." Minor Decl. ¶ 14; *see* 5/18/18 Letter from Foley to Simpson Manufacturing (including 1/31/17 Email from David to Mackenzie)(Minor Decl., Ex. M). Magstadt notes that Gardere never informed him or anyone else at Simpson Manufacturing that it had been prosecuting patents on behalf of OZCO. Magstadt Decl. ¶ 24.

On February 20, 2018, Simpson Strong-Tie responded to Gardere indicating that Gardere could not have obtained informed consent because it never sufficiently disclosed the nature of the potential conflict, for instance, that it "had been retained to prosecute the patents at issue." 2/20/18 Letter from Simpson Strong-Tie to Gardere at 2 (Minor Decl.¶6; *id*., Ex. H). Simpson Strong-Tie also took issue with Gardere's assertion that there was "no conflict because [Gardere] represents only Simpson Manufacturing and not its wholly-owned subsidiary, Simpson Strong-Tie… ." *Id*. Gardere did not respond to this letter. Minor Decl. ¶ 16.

## II. PROCEDURAL HISTORY

On February 23, 2018, Simpson Strong-Tie filed this action seeking declarations that it does not infringe the '701 Patent and that the '701 Patent is invalid. Compl. (Dkt. No. 1). OZCO sought and obtained two extensions to respond to the complaint. Dkt. Nos. 12, 18. Prior to responding to the complaint in this action, OZCO filed a lawsuit in the Eastern District of Texas on May 1, 2018 accusing Simpson Strong-Tie of infringing the '701 Patent and U.S. Patent No. 9,957,998 ("the '998 Patent"), which issued the same day OZCO filed suit. *Oz-Post International, LLC, d/b/a Ozco Building Products v. Simpson Strong-Tie Company, Inc*., Case No. 4:18 cv 00319 (the "Texas Action").

On May 18, 2018, Simpson Strong-Tie amended its complaint to add claims of false

advertising after OZCO failed to respond to Simpson Strong-Tie's earlier demand to cease circulating false advertisements.[7]  Am. Compl. (Dkt. No. 22); *see* 4/16/18 Letter from Simpson Strong-Tie to OZCO (Minor Decl. ¶ 7; *id.*, Ex. E).  And on May 31, 2018, OZCO amended its complaint in the Texas Action to add declaratory relief claims that mirror Simpson Strong-Tie's False Advertising claims here.  Minor Decl. ¶ 8; *see* Ozco's Amended Compl. in the Texas Action (Minor Decl. ¶ 8; *id.*, Ex. F).  Simpson Strong-Tie intends to seek dismissal or transfer of the Texas Action based on the first-to-file rule.  Minor Decl. ¶ 9.

On June 1, 2018, OZCO responded to the complaint in this action with a motion to transfer venue.  Mot. to Dismiss or Transfer at 4 ("Mot.")(Dkt. No. 30).  Simpson Strong-Tie filed a motion to disqualify OZCO's counsel, Foley, based on an alleged concurrent representation that breaches Foley's duty of loyalty two weeks later.  Mot. to Disqualify Counsel ("DQ Mot.")(Dkt. No. 38).  I heard argument on both motions on August 8, 2018.

## LEGAL STANDARD

### I.  MOTION TO TRANSFER

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.  28 U.S.C. § 1404(a).  District courts have the broad discretion to adjudicate motions to transfer on a case-by-case basis.  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).  Prior to granting a transfer of venue pursuant to 28 U.S.C. § 1404(a), a district court must find "that the transferee court is one where the action might have been brought and that the convenience of parties and witnesses in the interest of justice favor transfer."  *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985) (internal quotation marks omitted).

The factors used in the convenience analysis are:  (1) plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5)

---

[7] Simpson Strong-Tie alleges that OZCO disseminated false and misleading advertisements comparing certain products, some of which include the purportedly false statement that Simpson Strong-Tie's Hex-Head Washers have an "exposed driving port susceptible to corrosion."  4/16/18 Letter from Simpson Strong-Tie to OZCO.

9

familiarity of each forum with the applicable law, (6) feasibility of consolidation of other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum. *See, e.g., Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 776 (N.D. Cal. 2014); *Barnes & Noble, Inc. v. LSI Corp.*, 823 F. Supp. 2d 980,993 (N.D. Cal. 2011); *Vu v. Ortho-McNeil Pharm.*, Inc., 602 F. Supp. 2d 1151, 1156 (N.D. Cal. 2009). "The party seeking transfer has the burden of showing that transfer is appropriate." *Sarinana v. DS Waters of Am., Inc.*, No. C-13-0905 EMC, 2013 U.S. Dist. LEXIS 95649, at *3 (N.D. Cal. July 9, 2013).

## II.    MOTION TO DISQUALIFY COUNSEL

The Northern District of California local rules require attorneys permitted to practice here to "[b]e familiar and comply with the standards of professional conduct required of members of the State Bar of California[.]" Civil L. R. 11-4; *see also Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1103 (N.D. Cal. 2003)("The Northern District of California has adopted the California Rules of Professional Conduct at Civ. L.R. 11–4, and attorneys practicing in this court are required to adhere to those standards, as articulated in the rules and any court decisions interpreting them.").

"The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers." *Visa*, 241 F. Supp. 2d at 1103–04 (citing *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996)). But "[m]otions to disqualify counsel are strongly disfavored." *Id*. at 1104. "A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except when of absolute necessity." *In re Marvel*, 251 B.R. 869, 871 (Bankr. N.D. Cal. 2000)(citing *Schiessle v. Stephens*, 717 F.2d 417 (7th Cir. 1983)). "They are often tactically motivated[,]" and "tend to derail the efficient progress of litigation." *Id*. (citing *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2nd Cir. 1983)). "The moving party, therefore carries a heavy burden and must satisfy a high standard of proof." *Id*. "Because of the potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny." *Id*.

"In reviewing a motion to disqualify counsel, the district court must make 'a reasoned judgment and comply with the legal principles and policies appropriate to the particular matter at issue.'" *Visa*, 241 F. Supp. 2d at 1104 (quoting *Gregori v. Bank of America,* 207 Cal. App. 3d

291, 300 (1989)). "The district court is permitted to resolve disputed factual issues in deciding a motion for disqualification and must make findings supported by substantial evidence." *Id*. (citing *Dept. of Corporations v. SpeeDee Oil Change Syst.*, 20 Cal.4th 1135, 1143 (1999)).

## DISCUSSION

## I. MOTION TO DISMISS OR TRANSFER

OZCO moves to transfer this case to the Eastern District of Texas pursuant to 28 U.S.C. § 1404(a), or, in the alternative, to dismiss under the court's discretionary authority to hear (or not hear) declaratory relief cases. Mot. at 1.

### A. Whether this Action Should be Transferred

Neither party disputes that this case was properly brought here but could also have been brought in the Eastern District of Texas. Since OZCO concedes that venue is proper here, it has "the burden of showing that transfer is appropriate." *Sarinana*, 2013 U.S. Dist. LEXIS 95649, at *3; *see also Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."); *Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1092 (N.D. Cal. 2002)("[U]nder Ninth Circuit law, a plaintiff's choice of forum is accorded substantial weight in proceedings under this section, and courts generally will not transfer an action unless the 'convenience' and 'justice' factors strongly favor venue elsewhere.").

As an initial matter, this is the first-filed action, so OZCO cannot (and does not) argue that this case should be transferred because the Texas action was filed first.[8] *See Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir. 1982)(noting that the first-to-file rule "is a generally recognized doctrine of federal comity which permits a district court to decline

---

[8] As previously mentioned, Simpson Strong-Tie will seek to transfer the Texas Action to this forum based on the first-to-file rule. "Federal Circuit law controls the first-to-file rule in patent cases such as this, where an action for infringement and a declaratory judgment action for non-infringement are pending in different districts." *EMC Corp. v. Bright Response, LLC*, No. 12-cv-2841-EMC, 2012 U.S. Dist. LEXIS 132513, 2012 WL 4097707, at *3 n.2 (N.D. Cal. Sept. 17, 2012) (citations omitted). The Federal Circuit applies "the general rule favoring the forum of the first-filed case, unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, requires otherwise." *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005) (citation and internal quotation marks omitted).

11

jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district.").  Rather, OZCO focuses on the convenience analysis and argues that this declaratory judgment patent action should have been brought in the Eastern District of Texas because that is the location of "the hub of business activity surrounding" both parties' products, relevant witnesses and documents, and pending litigation, and, as a result, that disctrict has a strong interest in the case.  Mot. at 4.  But Simpson Strong-Tie counters that its "witnesses are located in California, the Accused Products were developed here, and they are sold here more than anywhere else."  Opp'n at 11.

### 1.    Simpson Strong-Tie's Choice of Forum

"[G]reat weight is generally accorded plaintiff's choice of forum[.]"  *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987).  "This deference is especially great when the plaintiff has chosen to file the lawsuit in its home forum."  *Finjan, Inc. v. Sophos Inc.*, No. 14-CV-01197-WHO, 2014 WL 2854490, at *3 (N.D. Cal. June 20, 2014).  Simpson Strong-Tie, a longtime resident of California, was accused of patent infringement in California and chose to file suit in its home state where it designed and developed the Accused Products, and where the majority of those products are sold.

As I move through the convenience factors, I keep in mind that "[t]he defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."  *Decker*, 805 F.2d at 843.

### 2.    Convenience of the Parties and Witnesses, and Ease of Access to the Evidence

OZCO argues that all of its witnesses are located in Texas, and specifically focuses on two former employees and other non-party witnesses, who live in northeast Texas and purportedly cannot be compelled to appear here, but are within the subpoena power of the Eastern District of Texas.  Mot. at 5–6.  It also underscores that it is a small company and six out of eleven of its employees will likely be key witnesses, so the burden of traveling to this district for trial would impact its ability to perform daily business activities.  *Id*. at 6.  On the other hand, Simpson Strong-Tie lists eight key witnesses based in Pleasanton, identifies the subject of each witness's

testimony, and emphasizes that its Texas branch has no relevance to this dispute.

"In considering the convenience of witnesses, courts have recognized that the convenience of *non-party witnesses* is more important than the convenience of party witnesses, including representatives of corporate parties." *Kaur v. US Airways, Inc.*, No. C-12-5963 EMC, 2013 U.S. Dist. LEXIS 64519, at \*12-13 (N.D. Cal. May 6, 2013); *see also Shabani v. Volkswagen Grp. of Am. Inc.,* C 12-02365 LB, 2012 U.S. Dist. LEXIS 142728, 2012 WL 4675047, at \*6 (N.D. Cal. Oct. 2, 2012) ("[T]hese corporate representatives and documents are under VW's control, and the convenience to VW is less important than the convenience of non-party witnesses"); *Clark v. Sprint Spectrum L.P.,* C 10-03625 SI, 2010 U.S. Dist. LEXIS 136510, 2010 WL 5173872, at \*3 (N.D. Cal. Dec. 15, 2010) ("The convenience of non-party witnesses is a more important factor than the convenience of the parties."). Moreover, courts have rejected arguments when "[t]he transfer would merely shift rather than eliminate the inconvenience." *Decker*, 805 F.2d at 843. I will therefore focus on the purported non-party witnesses.

Simpson Strong-Tie challenges whether the third parties identified by OZCO are actually necessary witnesses and underscores that it is OZCO's burden to "demonstrate, through affidavits or declarations containing admissible evidence, who the key witnesses will be and what their testimony will generally include." *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1119 (C.D. Cal. 1998); *see* Hill Decl. ¶ 5 (noting that "former OZCO employees are also *likely* witnesses")(emphasis added). Simpson Strong-Tie argues that it is insufficient for OZCO to identify individuals and their titles without explaining their anticipated testimony or relevance. Opp'n at 15. And it further contends that OZCO has not even established that any of the potential witnesses would be unwilling to travel to California.

In Reply, OZCO simply offers that the identified third parties are "relevant and key to this dispute" because they have knowledge concerning the design and marketing efforts of OZCO's products. It also emphasizes that Simpson Strong-Tie's allegedly infringing product deceived OZCO's distributors and customers, most of whom are located in Texas. Since OZCO merely asserts that "[t[hese non-party witnesses are relevant to the litigation and *may need* to be called at [sic] trial witnesses[,]" Mot. at 5–6 (emphasis added), it has not met its burden of demonstrating

13

that these individuals are key witnesses whose testimony at trial would be necessary. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335–36 (9th Cir. 1984)(noting that the district court "improperly focused on the number of witnesses in each location[,]" and "should have examined the materiality and importance of the anticipated witnesses' testimony and then determined their accessibility and convenience to the forum.").

OZCO emphasizes that it is a much smaller company, so half of its employees would be impacted whereas a small percentage of Simpson Strong-Tie's employees would have to travel. But shifting the inconvenience onto Simpson Strong-Tie does not justify a transfer. *See, e.g.*, *Van Dusen v. Barrack*, 376 U.S. 612, 645–46 (1964)("Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient."); *Barnes & Noble, Inc. v. LSI Corp.*, 823 F. Supp. 2d 980, 994 (N.D. Cal. 2011)(finding transfer inappropriate where "either forum would offer some conveniences and inconveniences to both the parties and witnesses"); *E. & J. Gallo Winery v. F. & P. S.p.A.*, 899 F. Supp. 465, 467 (E.D. Cal. 1994)("The inconvenience of [non-party witnesses]—though considerable—does not bear F & P's heavy burden of showing a strong balance of convenience for defendant.").

As for the relevant evidence, "[i]n patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009)(quoting another source). Therefore, the more convenient location is typically where an accused infringer's evidence is stored. *Id.* But in the age of electronically stored information, "[t]he ease of access to evidence is neutral because much of the evidence in this case will be electronic documents, which are relatively easy to obtain in any district." *Finjan*, 2014 WL 2854490, at *6.

### 3. "Interests of Justice" Factors

These factors—familiarity of each forum with the applicable law, feasibility of consolidation of other claims, any local interest in the controversy, and the relative court congestion and time of trial in each forum—are neutral or weigh slightly in favor of keeping the case here. In addition to Simpson Strong-Tie's federal claims, it asserts a California statutory claim for False Advertising in violation of California Business and Professions Code § 17500.

OZCO points out that Simpson Strong-Tie's state law claim for false advertising is "substantially congruent to claims made under the Lanham Act[.]"  *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014 WL 572290, at *3 (N.D. Cal. Feb. 11, 2014)(quoting another source).

Courts have found persuasive the argument that California district courts are more familiar adjudicating issues of California law, including claims for false advertising.[9]  *E.g.*, *Hendricks v. StarKist Co.*, No. 13-cv-729 YGR, 2014 U.S. Dist. LEXIS 41718, at *15-16 (N.D. Cal. Mar. 25, 2014)("[T]he Court finds merit to the argument that the California district courts are more familiar with the California laws governing the claims here."); *In re Ferrero Litig.*, 768 F. Supp. 2d 1074, 1081 (S.D. Cal. 2011)("A California district court is more familiar with California law than district courts in other states.").  This factor favors keeping the case here.

The consolidation factor does as well.  While the actions will likely be consolidated wherever they land, the first-to-file principle suggests that the cases should be consolidated here since this action was filed first.[10]  *See, e.g.*, *In re Ferrero Litig.*, 768 F. Supp. 2d at 1082 (considering the consolidation factor and finding that the first-to-file rule favored against transferring the action).

The parties dispute which forum has a stronger interest in this litigation.  Courts have found that the forum "with the most allegedly infringing sales" has a "significant interest" in a

---

[9] OZCO also argues that Simpson Strong-Tie's claims for false advertising "are without merit." Reply at 7.  While I need not assess the plausibility of the claims at this stage, I note that Simpson Strong-Tie's letter identifies the advertisements at issue, and points out how and why they are misleading.  *See* 4/16/18 Letter from Simpson Strong-Tie to OZCO (Minor Decl. ¶ 7; *id.*, Ex. E).

[10] Simpson Strong-Tie points out that OZCO has not argued that this is an anticipatory declaratory judgment action warranting an exception to the first-to-file rule.  Since OZCO had not communicated an "immediate plan[] to file suit, [Simpson Strong-Tie] could have reasonably believed that a declaratory judgment action was its best option to expedite a resolution." *Barnes & Noble, Inc. v. LSI Corp.*, No. C-11-2709-EMC, 823 F. Supp. 2d 980, 992 (N.D. Cal. 2011).  Given the purpose of the Declaratory Judgment Act, "the mere potential of future litigation would not render a declaratory judgment suit 'anticipatory' so as to vitiate the first-filed rule." *Id.*  Nor can this action be considered the winner in a "race to the courthouse," *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904-905 (Fed. Cir. 2008), since Simpson Strong-Tie filed this action one year after OZCO's first demand letter and one month after the second letter, it "does not come close to 'literally sprinting to the courthouse the same day.'" *Trend Micro Inc. v. RPost Holdings, Inc.*, No. 13-cv-05227-WHO, 2014 U.S. Dist. LEXIS 47946, at *27 (N.D. Cal. Apr. 7, 2014).

1   patent infringement dispute.  *Royal Queentex Enters. v. Sara Lee Corp.*, No. C 99-4787 MJJ, 2000

2   U.S. Dist. LEXIS 10139, at *24 (N.D. Cal. Mar. 1, 2000).  Simpson Strong-Tie argues that

3   California has a greater interest because the Accused Products are designed, marketed and

4   predominantly sold in California, and it is harmed here.  OZCO insists that the Eastern District of

5   Texas has a greater interest because both parties conduct business in that district, OZCO's

6   headquarters is "minutes away from the district's border," and the impetus for both lawsuits is

7   "the deception of Simpson's infringing product in Texas."  Reply at 5.  Both forums have an

8   interest in this litigation; OZCO has not established that this factor tips in its favor.  *See, e.g.*,

9   *Royal Queentex*, 2000 U.S. Dist. LEXIS 10139, at *24.

10      The remaining factor, court congestion, appears to be neutral based on the nearly

11  equivalent statistics surrounding court congestion and time in each district.  U.S. Dist. Courts—

12  Combined Civ. & Crim. Fed. Ct. Mgmt. Statistics,

13  http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2017/09/30-1 (last

14  visited July 23, 2018)(noting, for fiscal year ending September 30, 2017, the average time from

15  filing to disposition in civil cases was 6.9 months in Eastern District of Texas and 7.2 months in

16  Northern District of California, and the average time from filing to trial in civil cases was 23.8

17  months in Eastern District of Texas and 24.8 months in Northern District of California).[11]  OZCO

18  also argues that the recent decision in *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, ___

19  U.S. ___, 137 S. Ct. 1514 (2017) has led to an increase of patent cases in the Northern District of

20  California and a decrease in the Eastern District of Texas, which has yet to be reflected in the

21  court statistics.  While this may be true, it does not sway the overall balance because this "minor"

22  factors add little to the analysis.  *See Royal Queentex*, 2000 U.S. Dist. LEXIS 10139, at *24

23  ("Relative court congestion is at best, a minor factor in the section 1404 calculus.").

24      OZCO has not met it burden to show that the convenience of the parties and the interest of

25  justice warrant transferring this case.

26

27

28

---

[11] OZCO cited different statistics in its motion, which I do not see in the cited table.

16

### B.     Whether this Action Should Be Dismissed

In the alternative, OZCO argues that I should decline to exercise my discretionary authority over this declaratory relief action and dismiss this case. This argument ignores Simpson Strong-Tie's affirmative claims for false advertising. It makes little sense to dismiss the declaratory relief claims and leave other claims pending. Moreover, OZCO fails to offer any cases in which a court has declined to exercise jurisdiction over a first-filed declaratory relief action in favor of a later-filed infringement case.

"The purpose of the Declaratory Judgment Act ... in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008)(quoting another source). "A district court, when deciding whether to exercise its discretion, should decide whether hearing the case would 'serve the objectives for which the Declaratory Judgment Act was created.'" *Id*. OZCO does not and cannot argue that Simpson Strong-Tie's declaratory relief claims do not serve the purpose of the Declaratory Judgment Act; rather, it contends, without support, that I dismiss this suit and allow the parties to resolve their dispute in the Eastern District of Texas litigation. Mot. at 11. Since this is the first-filed action, I see no basis for declining to exercise jurisdiction over Simpson Strong-Tie's case. OZCO's motion to dismiss or transfer is DENIED.

## II.     MOTION TO DISQUALIFY COUNSEL

Foley acknowledges that it currently represents Simpson Strong-Tie in labor and employment matters while simultaneously representing OZCO in this case adverse to Simpson Strong-Tie. Opp'n at 3 (Dkt. No. 42). But it contends that these concurrent representations do not violate California Rule of Professional Conduct 3-310 ("Rule 3-310") given Simpson Management's advance conflict waiver. To the extent Simpson Strong-Tie intends to rely on the Gardere representation in the Condemnation Action, Foley also insists that Simpson Management "affirmatively waived the present conflict[.]" *Id*. at 4.

### A.     Rules Governing Concurrent Representation

California Rule of Professional Conduct 3-310, provides, in part, that

> A member shall not, without the informed written consent of each client:
> (1) Accept representation of more than one client in a matter in

17

which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

Cal. Rule Prof. Conduct 3-310(C). Rule 3-310 defines "disclosure" as "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client[.]" Cal. Rule Prof. Conduct 3-310(A). And it defines "informed written consent" as "the client's or former client's written agreement to the representation following written disclosure[.]" Cal. Rule Prof. Conduct 3-310(A).

"A concurrent conflict places the interests of two current clients at odds." *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp. 3d 1100, 1108 (E.D. Cal. 2015). Rule 3-310 creates a presumption that the duty of loyalty has been breached when a law firm concurrently represents two clients whose interests are adverse, even on unrelated matters. *Visa*, 241 F. Supp. 2d at 1104; *see also White v. Experian Info. Sols.*, 993 F. Supp. 2d 1154, 1161 (C.D. Cal. 2014)("The default rule for a concurrent conflict in California is automatic disqualification in all but a small number of cases."); *Flatt v. Superior Court*, 9 Cal. 4th 275, 284 (1994)("Even though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required.*")(emphasis in original).

The presumption may be rebutted, however, "if full disclosure of the situation is made to both clients and both agree in writing to waive the conflict." *Visa*, 241 F. Supp. 2d at 1105. Under California law, an advance waiver of potential future conflicts is permitted, "even if the waiver does not specifically state the exact nature of the future conflict." *Id.* (citing *Maxwell v. Superior Court,* 30 Cal. 3d 606, 622 (1982)). "The only inquiry that need be made is whether the waiver was fully informed." *Id.*

### B. The Foley Engagement Agreement and Concurrent Representation

Simpson Strong-Tie is not a party to the Foley Engagement Agreement, but Foley nonetheless represents it in labor and employment matters, including the ongoing matter before the DFEH. *See* Magstadt Decl. ¶¶ 10–18. The Conflicts provision provides,

This Agreement creates an attorney/client relationship only between [Foley] and [Simpson Manufacturing]. Therefore, [Simpson Manufacturing] agrees that this engagement does not create an attorney/client relationship between [Foley] and any business entities with which you are affiliated unless subject to separate engagement Agreement. [Simpson Manufacturing] will not provide [Foley] with any confidential information about any of its other subsidiaries or affiliates, and [Foley] will not provide services to [Simpson Manufacturing's] subsidiaries or affiliates unless [Foley] represents such subsidiary or affiliate. [Simpson Manufacturing] agrees that [Foley's] representation of [Simpson Manufacturing] will not create any conflicts of interest in the event that other clients of [Foley] are adverse to a subsidiary or affiliate of [Simpson Manufacturing] (unless that subsidiary or affiliate also is represented by [Foley]).

Foley Engagement Agreement, § 3. Yet Simpson Strong-Tie insists that its absence from the Engagement Agreement is "irrelevant to the question of whether Foley represents Simpson Strong-Tie." DQ Mot. at 12.

In *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, the Hon. Kimberly J. Mueller assessed a similar situation in which the parent company was named in the engagement agreement, which included an explicit provision identifying the client as the parent and not any subsidiaries, but the firm nonetheless expanded its representation to include certain subsidiaries. 105 F. Supp. 3d 1100, 1113–14 (E.D. Cal. 2015). Judge Mueller concluded that the firm's conduct demonstrated that both the parent and subsidiary were current clients, notwithstanding the language of the agreement. *Id*. at 1114; *see also id.* at 1119 ("It [Hogan Lovells] directly represented CH2M's subsidiaries in the Savannah River fee dispute without updating its engagement letter, despite its original intent not to represent a subsidiary absent express written agreement.").

Foley does not dispute that it currently represents "Simpson," although that acknowledgement is somewhat muddied because it uses "Simpson" to refer to both Simpson Strong-Tie and Simpson Manufacturing. *See* Opp'n at 3 ("Foley does not dispute that it currently represents Simpson in L&E matters and currently represents OZCO in this patent case adverse to Simpson."). Regardless, as in *Lennar*, its conduct establishes that it currently represents Simpson Strong-Tie, notwithstanding the language of the Engagement Agreement.

Since Foley is concurrently representing Simpson in labor and employment matters and OZCO, its adversary in this case, there is a presumption that Foley's duty of loyalty has been

1  breached.  *Visa*, 241 F. Supp. 2d at 1104.  Foley aims to rebut the presumption by relying on the

2  advanced waiver provision of the Foley Engagement Agreement, but Simpson Strong-Tie insists

3  that Foley cannot enforce the agreement against it.

### C.  The Advanced Waiver Applies to Simpson Strong-Tie

5  Simpson Strong-Tie emphasizes that it is not a party to the Foley Engagement Agreement.

6  But both parties tacitly acknowledge that Foley's work for Simpson Strong-Tie stems from the

7  Foley Engagement Agreement.

8  "California law recognizes that a parent corporation and its subsidiary, even if wholly

9  owned, are generally regarded as separate entities for conflicts purposes, unless an exception

10  applies—where the relationship between the entities are such they have a 'unity of interests' so as

11  to deserve being treated as one."  *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,

12  264 F. Supp. 2d 914, 920–21 (N.D. Cal. 2003).  The *Argonaut* court applied the "unity of interest"

13  test of *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223 (1999), in

14  the context of concurrent representation of adverse interests and concluded that "[t]he question …

15  is whether there is a sufficient unity of interest between [parent] and [subsidiary] such that [the

16  firm's] representation of [parent's adversary] in the instant case reasonably diminishes the 'level

17  of confidence and trust in counsel' held by [subsidiary]."  264 F. Supp. 2d at 922.  The court found

18  two factors "militate[d] in favor of finding a reasonable basis for a diminution of such trust and

19  confidence[:]" the financial impact of the instant litigation on the subsidiary, and "the management

20  operations and the legal affairs" were "essentially identical" for both the parent and subsidiary.  *Id.*

21  at 923–24.

22  As discussed above, Foley actually represents Simpson Strong-Tie, so I need not analyze

23  whether there is a "unity of interests" between Simpson Manufacturing and Simpson Strong-Tie.

24  But there is absolutely a "unity of interests," and I quickly address the issue to expose Simpson

25  Strong-Tie's attempts to acknowledge its separate corporate status only when advantageous.  In

26  the event Foley disputed its representation of Simpson Strong-Tie, Simpson Strong-Tie argued

27  that the two companies share a unity of interests such that they should be treated as one for

28  conflicts purposes.  *See* DQ Mot. at 13 n.7; *see also id.* at 8 (arguing, with respect to the Gardere

representation in the Condemnation Action that "Simpson Manufacturing and Simpson Strong-Tie are operationally interrelated and have a unity of interests that are completely aligned, they should be considered a single entity for conflicts purposes.").

Magstadt, the chief financial officer of both companies, acknowledges the "complete overlap in management control." Magstadt Decl. ¶ 6. Moreover, Simpson Strong-Tie accounts for all of Simpson Manufacturing's domestic revenue and "it is the entity that employs Simpson Strong-Tie's non-exempt employees[,]" *id*. ¶¶ 5, 19, so it is unclear how any of Foley's labor and employment representation would have been limited to Simpson Manufacturing in the first place. The financial consequences of this litigation will equally impact Simpson and Simpson Manufacturing, and "the management operations and the legal affairs" are "essentially identical" for both the parent and subsidiary. *See* 264 F. Supp. 2d at 923–24.

Under these circumstances, the Engagement Agreement can be enforced against Simpson Strong-Tie. It is clearly benefiting from Foley's representation under the Engagement Agreement and the individual that signed the Engagement Agreement on behalf of Simpson Manufacturing also serves as the chief financial officer for Simpson Strong-Tie. It must have been the intended beneficiary of the Engagement Agreement, as evidenced by Foley providing services for Simpson Strong-Tie and Simpson Manufacturing paying Simpson Strong-Tie's legal bills (and because Simpson Strong-Tie would be the likely entity with domestic labor and employment matters). It aims to benefit from the Engagement Agreement, while ignoring the conditions of the agreement. *See supra* section B.1. I cannot endorse this strategic positioning. In this case, the advanced waiver can be enforced against it.

### D. The Advanced Waiver And Informed Consent

"An evaluation of whether full disclosure was made and the client made an informed waiver 'is obviously a fact-specific inquiry.'" *Visa*, 241 F. Supp. 2d at 1106. Courts look to the following factors to guide the inquiry:

> [T]he breadth of the waiver, the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the future), the quality of the conflicts discussion between the attorney and the client, the specificity of the waiver, the nature of the actual conflict (whether the attorney sought to represent both clients in the same dispute or in unrelated

disputes), the sophistication of the client, and the interests of justice.

*Id*.

The advanced waiver from the Foley Engagement Agreement provides,

> [Simpson Manufacturing] agrees that [Foley] may represent current or new clients in work directly adverse to [Simpson Manufacturing], and may be adverse to the business entities with which you are affiliated, provided such work is not substantially related to the Matter and [Foley] does not use any of [Simpson Manufacturing's] confidential information in representing such clients. This consent includes our being counsel in litigation or other formal disputes adverse to [Simpson Manufacturing]. In addition, [Simpson Manufacturing] agrees that, even though [Foley] represents [Simpson Manufacturing] in this Matter, [Foley]
> may represent in the future other parties who are adversely involved in the Matter, or who may later become adversely involved in the Matter, as long as that representation of other parties is substantially unrelated to the Matter. By way of examples only, and assuming such representations are not substantially related to the Matter, we may represent one or more parties in bankruptcy cases that may have interests adverse to [Simpson Manufacturing], we may represent clients with regard to intellectual property rights that may be adverse to those of [Simpson Manufacturing], or we may represent clients in contract negotiations adverse to [Simpson Manufacturing]. [Foley] agrees that it will not use any of [Simpson Manufacturing's] confidential information in representing such other clients and, when needed, we will establish an ethical wall to assure that confidential information is not exchanged between those working on the Matter and those working for such other clients.

Foley Engagement Agreement § 4. Numerous courts have found similar "broad, general, and indefinite" advance waivers insufficient disclosure to establish the client's informed consent.

### 1. The Advance Waiver is Broad, Open-Ended, and Non-Specific (Factors 1, 2, and 4)

Foley acknowledges that the advance waiver is "unlimited in time" and "broad in scope[,]" but argues that it is "very specific" because it states that the consent concerns "litigation or other formal disputes adverse to the Company" and provides non-limiting examples such as "intellectual property rights[.]" Opp'n at 6. It also insists that the scope is limited because any future adverse representation must be "substantially unrelated to the Matter." Courts have repeatedly rejected these arguments and labeled similarly worded advance waiver provisions "broad, general, and indefinite." *E.g.*, *Lennar*, 105 F. Supp. 3d at 1114–19 (E.D. Cal. 2015) (finding broad, general, indefinite waiver insufficient to waive future conflict of interest stemming from concurrent representation); *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F. Supp. 3d 1074, 1083 (C.D.

22

Cal. 2015) (same)[12]; *Concat LP v. Unilever, PLC*, No. C-04-1396-SI, 350 F. Supp. 2d 796, 820 (N.D. Cal. 2004)(same)[13]; *TransPerfect Glob., Inc. v. MotionPoint Corp.*, No. C-10-02590 CW (JCS), 2012 U.S. Dist. LEXIS 85649, at *28–32 (N.D. Cal. June 20, 2012)(finding no informed written consent in an engagement agreement that did not mention the party or the matter). Nonetheless, the provision does mention litigation, it explicitly lists intellectual property, and it is limited to "substantially unrelated" matters.

### 2. The Quality of the Conflicts Discussion (Factor 3)

According to Magstadt, Foley did not discuss the advance waiver provision with him prior to executing the Engagement Agreement. Magstadt ¶ 9. Foley does not dispute this assertion and admits that "no record exists of any specific discussion concerning the waiver at the time it was signed… ." Opp'n at 7. But it looks to the communication between Simpson Manufacturing's former vice president Jeff Mackenzie and former Gardere attorneys regarding the Condemnation

---

[12] The waiver provided, "[i]t is possible that some of our current or future clients will have disputes with you during the time we are representing you. We therefore also ask each of our clients to agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you, even if the interest of such clients in those unrelated matters are directly adverse to yours...." *W. Sugar*, 98 F. Supp. 3d at 1083.

[13] The waiver provided:

> Morgan, Lewis & Bockius is a large law firm, and we represent many other companies and individuals. It is possible that some of our present or future clients will have disputes or other dealings with you during the time that we represent you. Accordingly, as a condition of our undertaking of this matter for you, you agree that Morgan, Lewis & Bockius may continue to represent, or may undertake in the future to represent, existing or new clients in any matter, including litigation, that is not substantially related to our work for you, even if the interests of such clients in those other matters are directly adverse to you. Further, you agree in *802 light of its general consent to such unrelated conflicting representations, Morgan, Lewis & Bockius will not be required to notify you of each such representation as it arises. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as the result of our representation of you, we have obtained confidential information of a non-public nature that, if known to another client of ours, could be used to your material disadvantage in a matter in which we represent, or in the future are asked to undertake representation of, that client.

*Concat*, 350 F. Supp. 2d at 801–02.

1    Action as "instructive." *Id.* In that communication, Gardere attorney Kate David wrote the

2    following:

> As a heads up, one of our attorneys has been approached about filing
> a patent infringement suit against Simpson Strong-Tie Co. Gardere
> does not represent Strong-Tie and our engagement letter provides
> that it's okay for us to be adverse to your affiliates, but as we are
> handling the condemnation for Simpson Manufacturing, I wanted to
> run this by you.
> Please let me know if this is okay or if you'd like to discuss in more
> detail.

7    1/31/17 Email from Gardere to Simpson Manufacturing (Dkt. No. 38-1 at 31). Mackenzie

8    responded, "I don't think that that would be an issue as long as no information is shared." *Id.*

9        Foley argues that Simpson Manufacturing's informed consent in that situation suggests

10   that consent should be inferred under these circumstances because "Simpson has not explained

11   why they would agree to the adverse representation in view of land condemnation but not in view

12   of [labor and employment] matters… ." Opp'n at 7. This is true, but irrelevant. The burden is not

13   on Simpson Strong-Tie to explain why consent would not have been given had a discussion

14   occurred. *See Lenmar*, 105 F. Supp. 3d at 1118 ("The court declines to accept Steadfast's

15   argument at hearing, that CCI bore the burden of showing it had withheld consent.").

16       Moreover, Simpson Strong-Tie challenges the sufficiency of this email disclosure given

17   that Gardere never disclosed the name of the client, whether or not it was a current or prospective

18   client, and the precise nature of the representation, including that Gardere had been prosecuting

19   patents on OZCO's behalf—patents that were intended to cover Simpson Strong-Tie's products.

20   Given these omissions, Simpson Strong-Tie contends that Mackenzie's consent was not fully

21   informed. On the other hand, Gardere's disclosure identifies the specific nature of the matter

22   (patent infringement) and the possibility that it would be filed against Simpson Strong-Tie. If

23   Mackenzie had concerns based on this information, he could have sought additional information,

24   but instead he expressed his perspective that the representation should not present an issue as long

25   as no information is shared.

26       The Mackenzie-David exchange has no bearing on the quality of the conflicts discussion

27   concerning the Foley Engagement Agreement; Foley acknowledges that there is no evidence of

28   any discussion. The Mackenzie-David exchange is, however, relevant to whether Gardere

24

obtained a second waiver with respect to the underlying conflict prior to the merger with Foley. *See* D.5 below re: interests of justice factor. If anything, the Gardere exchange shows that the most prudent course of action would have been for Foley to inform Simpson[14] that Foley would be representing OZCO in this patent infringement suit involving Simpson Strong-Tie, just as the Gardere attorneys did with respect to their representation of Simpson in the Texas Condemnation Action. The disclosure would have been especially warranted since Foley was not representing OZCO when Simpson Strong-Tie filed this action (prior to the merger), but was (and is) representing "Simpson" in labor and employment matters. Under these circumstances, Foley should have made efforts to obtain a "second waiver." *See, e.g.*, *Concat*, 350 F. Supp. 2d at 821 ("[E]ven if a prospective waiver of conflict has been obtained, the attorney must request a second, more specific waiver, 'if the [prospective] waiver letter insufficiently disclosed the nature of the conflict that subsequently arose between the parties.'")(quoting *Visa*, 241 F. Supp. 2d at 1106).

### 3. The Nature of the Actual Conflict (Factor 5)

Simpson Strong-Tie admits that the matters are unrelated. DQ Mot. at 17. The advance waiver explicitly states that Foley would not seek to represent an adverse client in a "substantially related" matter.

### 4. The Sophistication of the Client (Factor 6)

Simpson Strong-Tie acknowledges that Simpson Manufacturing is "a public company with experience in hiring outside counsel," but emphasizes that neither entity "employs any in-house lawyers, not do they have an in-house legal department." DQ Mot. at 17. It underscores that the individuals responsible for evaluating engagement agreements and hiring outside counsel are lay businessmen and businesswomen. *Id.*; *see* Magstadt Decl. ¶ 7. OZCO cites to *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*, 187 Cal. App. 4th 1405 (2010), to support its contention that an agreement entered into by a sophisticated party should generally be enforced. *See* Opp'n at 11 (citing *Cotchett*, 187 Cal. 4th at 1419–20).

---

[14] Given the "complete overlap" in management, this is an instance where there is no real distinction between Simpson Manufacturing and Simpson Strong-Tie. If Foley had informed Magstadt, both entities would have learned of the conflict.

This factor adds little to the analysis. With respect to *Cotchett*, the facts are very different: when analyzing unconscionability in the context of a fee agreement, the party arguing for the unenforceability of that contract, a "sophisticated corporate client," employed outside counsel to negotiate the fee agreement. *Cotchett*, 187 Cal. App. at 1421. Here, Simpson Manufacturing had no outside counsel and no in-house counsel assisting in its review of the Engagement Agreement. More on point, OZCO highlights Simpson Manufacturing's size, experience as a party in litigation, and extensive intellectual property portfolio to urge that it must "ha[ve] someone in-house responsible for its legal services." Opp'n at 13.[15] It also underscores the fact that Simpson retained outside counsel for various disputes depending on counsel's subject matter expertise, which implies a certain level of sophistication.

While neither Simpson entity utilizes in-house counsel, they do have extensive experience hiring outside counsel. They cannot and do not deny the fact that they are sophisticated corporate entities. Courts have found this factor satisfied under less persuasive circumstances. *See, e.g.*, *Concat*, 350 F. Supp. 2d at 820 ("Dr. Winchel's education and business experience are strongly indicative of a high degree of sophistication[.]"). Yet as Simpson Strong-Tie emphasizes, there is a limit to the weight of this factor, especially in the absence of full disclosure, such as here, when Simpson Manufacturing was never made aware of the precise nature of the concurrent representation of an adverse party. Simpson Strong Tie also highlights that "California's 'policy, as correctly distilled by the *Visa* and *Concat* courts, encompasses a broader range of concerns that goes beyond the client's sophistication or the absence of a direct and substantially related conflict.'" *Lennar*, 105 F. Supp. 3d at 1118; *see also Concat*, 350 F. Supp. 2d at 822 (granting motion to disqualify despite party sophistication). This factor is neutral.

### 5. The Interest of Justice (Factor 7)

During the hearing, Simpson Strong-Tie argued that *Visa* dictates that the interest of justice factor only becomes relevant if a party has brought a motion to disqualify opposing counsel for

---

[15] OZCO unpersuasively points to Simpson employee Steve Rotzin, whose job title is Intellectual Property & Legal Services Manager, and who is currently in law school. Steve Rotzin LinedIn Profile (McKnight Decl. ¶ 10; *id*., Ex. 9). OZCO's meager effort to rely on an employee in law school to demonstrate Simpson's legal sophistication is baffling.

1    strategic reasons.  I do not read *Visa* in this way.  After listing the relevant factors, which ends

2    with the interest of justice, the court dropped the following footnote:

3             Visa and Heller argue that the prejudice to Visa caused by the
         disqualification of its counsel of choice should be taken into
4             account. The court, however, may not balance Visa's interests
         against First Data's unless there is a showing that First Data
5             unreasonably delayed bringing this motion for tactical reasons.
         *Dept. of Corporations,* 20 Cal.4th 1135, 1145 n. 2, 86 Cal.Rptr.2d
6             816, 980 P.2d 371 (1999); *River West, Inc. v. Nickel,* 188
         Cal.App.3d 1297, 1307–09, 234 Cal.Rptr. 33 (1987). The record
7             does not support such a finding here.

8    241 F. Supp. 2d at 1106 n.6.  The footnote and cases cited suggest that the court should not

9    consider the *interests of the parties* (distinct from the interest of justice) unless there is a potential

10   that "tactical abuse underlies the disqualification motion."  *Dept. of Corporations*, 20 Cal. 4th at

11   1145.  The California Supreme Court noted, "[d]epending on the circumstances, a disqualification

12   motion may involve such considerations as a client's right to chosen counsel, an attorney's interest

13   in representing a client, the financial burden on a client to replace disqualified counsel, and the

14   possibility that tactical abuse underlies the disqualification motion."  *Id*.  It continued,

15   "[n]evertheless, determining whether a conflict of interest requires disqualification *involves more*

16   *than just the interests of the parties*."  *Id*.  And it went on to outline the disqualification principles.

17   *See id*.  Those principles lie at the heart of the interest of justice factor, which must be considered

18   in assessing any motion to disqualify, regardless of the absence of tactical abuse.

19        "[D]isqualification motions involve a conflict between the clients' right to counsel of their

20   choice and the need to maintain ethical standards of professional responsibility."  *SpeeDee Oil*, 20

21   Cal. 4th at 1145.  The California Supreme Court has noted that "[t]he paramount concern must be

22   to preserve public trust in the scrupulous administration of justice and the integrity of the bar."  *Id*.

23   In this vein, "[t]he important right to counsel of one's choice must yield to ethical considerations

24   that affect the fundamental principles of our judicial process."  *Id*.  A court must "balance[] the

25   need to maintain ethical standards of professional responsibility, preservation of public trust in the

26   scrupulous administration of justice, and the integrity of the bar against a client's right to chosen

27   counsel, and the burden on the client if its counsel were disqualified."  *Western Sugar*, 98 F. Supp.

28   3d at 1092.

1    I am not convinced that the ethical standards, the preservation of public trust, and the
2    integrity of the bar are truly at play in this case. A quick summary of the facts proves the point.
3    Simpson's relationship with Foley derives from its connection with a particular attorney, who
4    moved to Foley from another firm. *See* Magstadt Decl. ¶ 9. At the time Simpson Strong-Tie filed
5    this action, Gardere *already represented* OZCO, but the merger had not yet occurred. Foley first
6    made an appearance because OZCO needed California counsel to seek an extension of time to
7    respond to the complaint. This is not a case as in *Lenmar* where a firm "realized it faced a conflict
8    but determined it would take on representation" anyway, and then relied on an advance waiver to
9    argue against disqualification. 105 F. Supp. 3d at 119. The conflict arose as the result of a
10   merger, not because Foley "accepted" representation of an adverse client. *See* Cal. Rule Prof.
11   Conduct 3-310(C). Moreover, Gardere represented Simpson Manufacturing in the Condemnation
12   Action under an agreement that contained an advance waiver provision, and arguably obtained a
13   second waiver related to its potential representation of a party adverse to Simpson Strong-Tie and
14   pertaining to intellectual property rights.[16]

15       In this case, where the actual conflict arose as the result of several moving pieces including
16   a merger, I am not convinced that a legitimate threat to the integrity of the bar outweighs OZCO's
17   right to its chosen counsel and the resulting burden on it if this motion were to be granted. *See*
18   *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 809 (2010) (noting that "the general policy
19   concern of 'client protection'" is "a two-fold concern" involving "the interest in protecting client
20   confidences" and "the interest in protecting a client who has established a longstanding
21   relationship with counsel, and is at risk of losing that attorney by means of vicarious
22   disqualification, through no fault of the client (or the client's attorney).");  *id*. ("[W]ith the
23   proliferation of multi-office 'mega-firms,' frequent firm mergers, and attorneys increasingly
24   changing firms throughout their careers, clients are at greater risk of finding their longstanding
25   attorney-client relationships challenged due solely to their counsel's changing affiliations.").
26   Foley should have affirmatively sought a second waiver from Simpson Manufacturing following

27

28   _____
[16] As discussed above, Simpson Strong-Tie challenges the sufficiency of this disclosure.

its merger with Gardere and appearance in this action, but that failure does not justify its disqualification. *See id.* ("[I]n certain cases, the public trust in the scrupulous administration of justice is not advanced (and, in fact, may be undermined) by an order disqualifying a party's long-term counsel due to the presence of another attorney in a different office of the same firm, who possesses only a small amount of potentially relevant confidential information, *and* has been *effectively* screened.").

Moreover, despite Simpson Strong-Tie's protestations to the contrary, one could find that it brought this motion for strategic reasons. While there is admittedly no timing concern (such as the motion being raised at a late stage in the litigation, which is typically considered in assessing whether a disqualification motion has been filed for tactical reasons) there are several factors that suggest that Simpson is not truly concerned with a potential breach of the duty of loyalty. Even accepting the separate corporate personas despite the overlap in personnel, Simpson Manufacturing has known of the potential conflict since Ms. David's January 2017 email, and Simpson Strong-Tie has known of Gardere's representation of OZCO since the February 15, 2017 letter. Yet Simpson Strong-Tie first raised the potential conflict related to the Condemnation Action a year later in February 2018, after responding to certain issues on the merits. In addition, it initially focused on a purported conflict stemming from the Condemnation Action and then shifted its attention to Foley's representation related to labor and employment. But it did not make this pivot immediately after Foley made an appearance in this action (March 16, 2018), or in its April 19, 2018 correspondence after the official merger, or even in its May 4, 2018 letter notifying Foley of its intent to file a motion to disqualify. Those letters are exclusively focused on Gardere's representation of Simpson Manufacturing in the Condemnation Action and the imputation of that conflict to Foley post-merger. *See* 4/19/18 Letter from Minor to Ridley (Minor Decl., Ex. J, Dkt. No. 38-1 at 20); 5/4/18 Letter from Minor to Lopez (Minor Decl., Ex. L, Dkt. No. 38-1 at 26). Only after Foley raised the issue of its labor and employment-related representation of Simpson Manufacturing in its May 18, 2018 response letter did Simpson Strong-Tie seize on that concurrent representation as a basis for disqualification. *See* 5/18/18 Letter from Lopez to Minor (Minor Decl., Ex. M, Dkt. No. 38-1 at 29); 5/29/18 Letter from Minor to Lopez

29

(Minor Decl., Ex. N, Dkt. No. 38-1 at 34).

At bottom, there is no indication that there has been any threat to Foley's duty of loyalty here. The record evidence establishes that Simpson Strong-Tie continues to utilize Foley's services in labor and employment matters, and has not expressed dissatisfaction with that representation. *See* Magstadt Decl. ¶¶ 10–19. As OZCO's counsel argued during the hearing, granting this motion will only result in harm to OZCO with no benefit to Simpson (except the tactical advantage of disqualifying OZCO's long-time counsel).

"In reviewing a motion to disqualify counsel, the district court must make 'a reasoned judgment and comply with the legal principles and policies appropriate to the particular matter at issue.'" *Visa*, 241 F. Supp. 2d at 1104. Given the circumstances that led to the concurrent representation here and the edict that these motions are "highly disfavored," I will not disqualify Foley from representing OZCO. That said, I re-emphasize the importance of full disclosure. When Foley merged with Gardere, it should have informed Simpson of the conflict. Nonetheless, I am concerned with the prejudice to OZCO if I granted the motion to disqualify, and I am not concerned that denying this motion threatens California's ethical rules and policy.

## CONCLUSION

In accordance with the forgoing, OZCO's motion to transfer is DENIED, and Simpson Stonge Tie's motion to disqualify counsel is DENIED.

**IT IS SO ORDERED.**

Dated: August 17, 2018

William H. Orrick
United States District Judge